ORDERED.

Dated: July 13, 2020

_____
Karen S. Jennemann
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

| | |
|---|---|
| In re | ) |
| | ) |
| Malcolm John Wright, | ) Case No. 6:16-bk-00429-KSJ |
| | ) Chapter 7 |
| Debtor. | ) |
| | ) |
| Nancy J. Gargula, | ) |
| | ) |
| Plaintiff, | ) Adversary No. 6:16-ap-00058-KSJ |
| vs. | ) |
| | ) |
| Malcolm John Wright, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

The United States Trustee[1] objects to the Debtor, Malcolm Wright, receiving a discharge under § 727 of the Bankruptcy Code.[2] First, under § 727(a)(4), the UST argues the Debtor made alleged false oaths or actionable omissions on his bankruptcy statements and schedules. Second, under § 727(a)(2)(A), the UST contends the Debtor improperly granted a mortgage on his home to facilitate a friendly, collusive foreclosure intending to hinder, delay, or possibly defraud the

---

[1] Plaintiff originally was Guy G. Gebhardt and now is Nancy J. Gargula, both acting in their capacity as the Acting United States Trustee for Region 21, which includes Florida.
[2] All references to the Bankruptcy Code refer to 11 U.S.C. §§ 101 *et. seq.*

foreclosure efforts of the first mortgagee. Debtor denies these allegations. After considering the trial transcripts,[3] stipulations, evidence and post-trial briefs, the Court finds the Debtor is entitled to a discharge.

Before this bankruptcy was filed on January 21, 2016 (the "Petition Date"),[4] Debtor was a successful businessman for over forty years.[5] He was a chartered accountant and a sophisticated businessman, owning or working for well-funded companies selling or developing real estate in the United States and Europe.[6] He routinely guaranteed repayment of large business loans and debts, listing unsecured claims against him of about $125 million when this bankruptcy was filed.[7]

Prior to the collapse of the Debtor's financial world after the recession of 2008, the Debtor lived lavishly. In 2006, he purchased an 11,500 square foot home in an exclusive community (the "Home") for $5.5 million.[8] Debtor paid $1.65 million in cash and obtained a first priority mortgage loan for $3.85 million from LaSalle Bank. N.A. (the "Bank").[9] Debtor later acquired a $500,000 second priority secured mortgage loan from SunTrust Bank ("SunTrust").[10] After the real estate crash, the Debtor was left with his Home, a few other assets, and large unsecured debt of around $125 million.

UST now seeks denial of the Debtor's discharge under §§ 727(a)(4)(A) and 727(a)(2)(A) of the Bankruptcy Code. The primary purpose of bankruptcy law is to provide an honest debtor

---

[3] Doc. No. 107. The Honorable Cynthia C. Jackson, who since has moved to the Jacksonville Division, presided over the trial on April 11, 2018. This case was assigned to me on December 13, 2019. In lieu of another trial, at the Pretrial conference held on January 17, 2020, the parties agreed I could rule based on the record before the Court. The trial transcript was requested and later filed on February 27, 2020. Doc. No. 107. I have thoroughly reviewed the transcript, the record, and all admitted exhibits prior to rendering this Memorandum Opinion.
[4] Doc. No. 1 in Main Case, 6:16-bk-00429-KSJ.
[5] Debtor started working in the 1970s as a chartered accountant in London, England, and then started working in real estate in the 1980s. Doc. No. 107. 4/11/18 Tr. at 21-22:11-25, 1-23.
[6] Doc. No. 107. 4/11/18 Tr. at 22:10-21; 23:11-14; 25:7-18.
[7] UST Ex. 3. The Debtor's schedules and statements also are contained at Doc. No. 1 in the Main Case, 6:16-bk-00429-KSJ.
[8] Doc. No. 107. 4/11/18 Tr. at 41:14-20; 43:3-5; Doc. No. 70, ¶1. Stipulated Timeline Regarding Isleworth Property.
[9] LaSalle Bank N.A. initially held the note and mortgage on the Home, which it later assigned to U.S. Bank. Nationstar acted as a servicer of the loan. For the purposes of this Memorandum Opinion, the exact role and relationship between LaSalle Bank, U.S. Bank and Nationstar is irrelevant. As such, the Court collectively refers to them as the "Bank."
[10] Doc. No. 107. 4/11/18 Tr. at 44-45:23-25, 1-5.

with a fresh start by relieving the burden of indebtedness.[11] Generally, objections to discharge should be construed liberally for the debtor and strictly against the objecting party.[12] However, this general policy applies only to the honest debtor.[13] Plaintiff must prove her objection with a preponderance of the evidence.[14]

### *11 U.S.C. § 727(a)(4)(A)*
### *False oath or account*

UST's first count is based on § 727(a)(4)(A) of the Bankruptcy Code that allows for denial of a debtor's discharge where the debtor "knowingly and fraudulently, in or in connection with the case . . . made a false oath or account."[15] To warrant denial of discharge based on a debtor's false oath, the objecting party must prove the false oath or omission was (1) fraudulently made, and (2) material.[16] Fraudulent intent usually is inferred from examining the totality of circumstances surrounding the debtors' bankruptcy case.[17] A fact is "'material,' and thus sufficient to bar discharge, if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property."[18]

The basis of UST's allegations relate to alleged misstatements and omissions made by the Debtor in his bankruptcy schedules and statement of financial affairs ("SOFA"), which are signed under oath.[19] The allegations mostly relate to minor, non-material omissions, items not added at the advice of bankruptcy counsel, or items listed, but perhaps on the wrong line or in a confusing manner. The Court concludes there were no ***materially*** false oaths or omissions that would justify denial of the Debtor's discharge.

---

[11] *Grogan v. Garner*, 498 U.S. 279, 286-87(1991).
[12] *In re Trafford*, 377 B.R. 387, 392 (Bankr. M.D. Fla. 2007). *See also In re Coady*, 588 F.3d 1312, 1315 (11th Cir. 2009).
[13] *Coady*, 588 F.3d at 1315 (citing *In re Jennings*, 533 F.3d 1333, 1338-39 (11th Cir. 2008)).
[14] Fed. R. Bankr. P. 4005; *Grogan v. Garner*, 498 U.S. 279, 111 S. Ct. 654, 112 L. Ed. 2d 755 (1991).
[15] 11 U.S.C. 727(a)(4)(A).
[16] *Swicegood v. Ginn*, 924 F.2d 230, 232 (11th Cir. 1991).
[17] *See In re Khanani*, 374 B.R. 878, 888 (Bankr. M.D. Fla. 2005).
[18] *Chalik v. Moorfield (In re Chalik)*, 748 B.R. 616, 618 (11th Cir. 1984).
[19] UST Ex. 3. Statement of Financial Affairs.

***$500 Debt to American Express***. Debtor failed to list on his Bankruptcy Schedule E/F[20] a debt of $500 due under an American Express Credit Card.[21] Debtor testified he believed no balance was due under the credit card on the Petition Date.[22] Debtor told his bankruptcy counsel about the credit card and, because the Debtor believed no amounts were owed, his counsel determined the credit card need not be listed.[23] Debtor later paid the balance owed.[24]

A $500 credit card debt is not sufficiently material to warrant wholesale denial of the Debtor's discharge, particularly when the Debtor promptly paid the debt upon discovering the balance due and the overall claims total $125 million. Debtor did not omit the credit card for a fraudulent purpose.

***Spouse's Income***. Schedule I requires Chapter 7 debtors to list the annual income of non-filing spouses. Debtor failed to list his spouse's, Bettina Brieke ("Brieke"),[25] annual income on his Schedule I.[26] UST contends Brieke's federal income tax returns for 2013 through 2015 demonstrate she has annual income of $15,000,[27] and her 2015 bank account statements demonstrate receipt of the income.[28]

Debtor did not know of this separate income (if any) because Brieke had not filed her federal tax returns when Mr. Wright filed this bankruptcy case. Brieke's accountant prepared the 2013 through 2015 federal income tax returns *after* the Petition Date.[29]

---

[20] UST Ex. 3, Bankruptcy Schedule E/F.
[21] UST Ex. No. 314. On February 16, 2016, the credit card balance was $479.29. The credit card statement does not provide the account balance for the Petition Date.
[22] Doc. No. 107. 4/11/18 Tr. at 142:7-13.
[23] Doc. No. 107. 4/11/18 Tr. at 104:13-19.
[24] Doc. No. 107. 4/11/18 Tr. at 142:14-16.
[25] Debtor's statements and schedules refer to Brieke as Tina Wright. Because Ms. Brieke filed tax returns using the name Bettina A. Brieke, the Court will refer to her as Brieke.
[26] UST Ex. 3, Bankruptcy Schedule I.
[27] UST Ex. 300-302. Debtor and Brieke file separate federal tax returns.
[28] UST Ex. 292. Debtor is not a co-owner on his wife's bank accounts.
[29] Doc. No. 107. 4/11/18 Tr. at 31:9-23; 143:4-19. No evidence refutes the conclusion that Brieke filed her federal tax returns for 2013 through 2015 after this bankruptcy case was filed.

Debtor further testified Brieke actually had no reportable income on the Petition Date, regardless of when her federal tax returns were filed.[30] Brieke receives rent from two residential rental properties. The properties operate at a loss;[31] all rental payments are deposited into her separate financial accounts, which contain commingled funds of her own.[32] And, although Brieke's bank account statements show many deposits, this alone does not demonstrate Brieke had *income* on the Petition Date that the Debtor needed to report. The Court finds Debtor's explanation credible that his wife had no regular reportable income on the day he filed this bankruptcy case. He did not knowingly and fraudulently make a false oath by failing to list Brieke's questionable "income" on his Schedule I.

***Furniture Valuation***. Question 23 of the Debtor's SOFA requires debtors to identify property they hold or control which belongs to someone else, including the property's owner, location and value.[33] Debtor listed furniture at the Home as owned by Brieke with a value of $3,000.[34] Debtor testified he initially purchased the furniture for $14,500,[35] and his bankruptcy paralegal adjusted the value downward to $3,000.[36] The paralegal, Ms. Gagnon, testified she recalled the Debtor listing a higher value, and she suggested including a more "realistic" or liquidation value of the furniture on the SOFA.[37]

Although the Debtor sold the furniture to Brieke in 2009 for $50,000,[38] and other documents attribute even greater values to the furniture,[39] the Court finds the Debtor did not knowingly and fraudulently make a false statement about the furniture. Debtor listed, perhaps in

---

[30] Doc. No. 107. 4/11/18 Tr. at 31:2-8; 142:19-21.
[31] Doc. No. 107. 4/11/18 Tr. at 33:15-25.
[32] Doc. No. 107. 4/11/18 Tr. at 34:1-9; 142:22-24.
[33] UST Ex. 3, Statement of Financial Affairs.
[34] UST Ex. 3, Statement of Financial Affairs.
[35] Doc. No. 107. 4/11/18 Tr. at 147-48:23-25,1-3.
[36] Doc. No. 107. 4/11/18 Tr. at 39:6-25; 136:1-6.
[37] Doc. No. 107. 4/11/18 Tr. at 87-88:15-25,1-7.
[38] UST Ex. 367. 3/2/16 Meeting of Creditors Tr. 111:1-10.
[39] Debtor and Brieke's Prenuptial Agreement provided a $70,000 furniture value (Debtor Ex. 46), and Debtor's 2015 May agreement with Yoder provided Brieke would receive $150,000 for the furniture (UST Ex. 271).

summary form, the furniture owned by his wife for at least five years before the bankruptcy was filed. Debtor considered the advice of a paralegal and then adjusted the value downward. No party has challenged Brieke's ownership of the furniture or contended the furniture is property of the Debtor's estate subject to administration by his Chapter 7 Trustee.

Debtor admittedly is not a professional appraiser of furniture valuation, but he paid $14,500 for it and sold it to his wife for more than it likely was worth five years *before* the Petition Date. None of the other documents relied upon by the UST consist of appraisals or sales that actually occurred. Short of getting a professional appraisal, the Debtor simply provided a value of his spouse's property with the help of a paralegal. He did not fraudulently misrepresent the value of the furniture.

***Valuation of Debtor's Interest in ALG***. SOFA Question 27 requires debtors to disclose any businesses they have owned within four years prior to the bankruptcy filing.[40] Although the Debtor listed his ownership interests in six other business entities,[41] the Debtor failed to list his 462,000 shares of American Leisure Group Limited ("ALG"), a defunct corporation, in response to SOFA Question 27. Debtor does not dispute he owns these shares of ALG but contends the stock has no value, as he told his lawyer.[42] Ms. Gagnon testified Debtor provided a spreadsheet to counsel's office listing the ALG stock, and, because the stock had no value, it was not listed.[43] UST did not dispute the Debtor had disclosed this information to his counsel nor that ALG is defunct and the stock valueless. The Debtor's failure to list the ALG stock is not material insofar as there is no asset for the Chapter 7 Trustee to administer. Debtor also relied upon advice of counsel in omitting the stock and did not knowingly make a false oath by failing to list the ALG

---

[40] UST Ex. 3. Statement of Financial Affairs.
[41] UST Ex. 3, SOFA Question No. 27. The listed entities include: RDG, LLC; Resorrts [*sic*] Development Group, LLC; South Shore Cove, LLC; Winbrook Development LLC; American Leisure Real Estate Group, LLC; and Florida World, Inc.
[42] Doc. No. 107. 4/11/18 Tr. at 79-80:18-25,1-2.
[43] Doc. No. 107. 4/11/18 Tr. at 91:8-21. The spreadsheet is at Debtor Ex. 40, pg. 21.

stock. That the Debtor listed his other business interests confirms he was not trying to hide his ownership of ALG.

***Omitted Lawsuits***. Question 9 of the SOFA asks debtors to identify any lawsuit they were a party to within one year of the bankruptcy filing.[44] Debtor listed four lawsuits but failed to disclose two others—*Wright v. Countrywide Financial*, Case No. 2014-CA-007937-O ("Countrywide Lawsuit") and *Wright v. Leventhal et. al.* 2015-CA-009554-O ("Leventhal Lawsuit"). It is these two omitted lawsuits that the UST claims justify denial of the Debtor's discharge.

The *Countrywide Lawsuit* involved the foreclosure of the Debtor's Home, and the Debtor's counterclaims against the lender.[45] Debtor identified the lawsuit in response to Question 34 of Bankruptcy Schedule A/B[46] as a "[p]otential lawsuit against mortgage company under Jenoski v. Countrywide Home Loans, Inc." with an "unknown" current value.[47] Debtor testified that he inadvertently missed separately listing the Countrywide Lawsuit on the SOFA.[48] Moreover, the UST acknowledges the lawsuit was dismissed eight months prior to the Petition Date for improper service.[49] Debtor did not knowingly and fraudulently make a false statement by failing to disclose the Countrywide Lawsuit on the SOFA when the case was dismissed when this bankruptcy case was filed, and he disclosed the lawsuit on his Bankruptcy Schedule A/B. He was not trying to hide any potential claim from his creditors or the Trustee.

The issues surrounding the alleged omission *Leventhal Lawsuit* are slightly more complicated. In response to Question 34 of Bankruptcy Schedule A/B, Debtor listed this

---

[44] UST Ex. 3. Statement of Financial Affairs.
[45] UST Ex. 62.
[46] UST Ex. 3, Schedule A/B.
[47] Doc. No. 107. 4/11/18 Tr. at 104-05; 25, 1-10.
[48] Doc. No. 107. 4/11/18 Tr. at 49;11-16.
[49] UST Ex. 63 and 64. On April 22, 2015, the Florida Circuit Court issued an Order to Show Cause directed to Debtor to show cause, in writing, within 10 days why case should not be dismissed without prejudice for failure to serve the complaint. On May 6, 2015, the Florida Circuit Court entered a Final Order of Dismissal of the Countrywide Lawsuit.

information: "Pending lawsuit Case No. 2015-CA-10277" with a current value of $1 million.[50] Debtor thought this reference disclosed his attempt to foreclose on ALG stock shares held by his business partners Ronald Leventhal and Frederick Pauzar after they defaulted on separate $500,000 promissory notes.[51] The value, $1 million, is correct; however, the case number is wrong.[52]

Ms. Gagnon testified Debtor provided counsel's office with a spreadsheet which lists Messrs. Leventhal and Pauzar each owing the Debtor $500,000 with "suit issued" next to the amounts owed.[53] UST did not dispute Debtor disclosed this information to his counsel. Based on the $1 million value listed for the 2015 "pending lawsuit," Debtor reasonably believed he disclosed the Leventhal Lawsuit. Again, this appears to be an honest mistake made by both counsel and the Debtor. The Court finds the Debtor did not knowingly or fraudulently make a false statement by failing to disclose the Countrywide Lawsuit, Leventhal Lawsuit, or the ALG Default Judgment on the SOFA.

*Petty Omissions*. UST last argues Debtor failed to list three items in his bankruptcy papers: (1) a British financial account at Abbey National Bank account with a balance of around $200, (2) his leased cell phone, and (3) a storage unit.

On the bank account, Debtor disclosed the Abbey National Bank account to his Chapter 7 Trustee at the meeting of creditors.[54] He stated his mother gave him the account in London, England, which he had not used in years.[55] Debtor could not explain why the account was not

---

[50] UST Ex. 3. Bankruptcy Schedule A/B.
[51] Doc. No. 107. 4/11/18 Tr. at 78:8-18; 145:5-24.
[52] The listed case number, 2015-CA-10277, actually relates to a final default judgment against ALG for over $31 million, in Case No. **2013**-CA-10277. Both the Debtor and his attorney believe this default judgment against ALG is valueless, for the same reason the ALG stock was valueless. The company was defunct and without assets. So, the default judgment against a defunct company, even though large, is valueless and was omitted from the Debtor's papers. Doc. No. 107. 4/11/18 Tr. at 144:6-11. Debtor listed the default judgment on the spreadsheet provided to his counsel. Debtor Ex. 40, pg. 21. He was not trying to hide the ALG Default Judgment from his Chapter 7 Trustee.
[53] Doc. No. 107. 4/11/18 Tr. at 93-94:17-25,1-13. The spreadsheet is Debtor Ex. 40, pg. 21.
[54] UST Ex. 367. 3/2/16 Meeting of Creditors Tr. 23:17-25.
[55] UST Ex. 367. 3/2/16 Meeting of Creditors Tr. 144-45: 13-25, 1-6.

listed, but believed it held 135 pounds sterling or roughly $200.[56] The omission was immaterial and an honest mistake, and constitutes no reason to deny the Debtor a discharge.

On the other two items, the Debtor had no obligation to list the storage unit or the cell phone. Debtor leases but owns no cell phone in order to get an upgraded model every two years.[57] He has no obligation to schedule the leased phone. Debtor also clarified that, although one of his listed businesses had a storage unit, he individually had no storage unit to list on his bankruptcy schedules.[58] Debtor had no obligation to list either item; their omission is proper.

"The entire thrust of an objection to discharge because of a false oath or account is to prevent knowing fraud or perjury in the bankruptcy case. As a result, the objection should not apply to minor errors."[59] Here, I conclude the lengthy list of "errors" were immaterial or incorrectly listed by the Debtor's lawyers. I cannot find a single instance where the Debtor made a materially false oath with any fraudulent intent as required by § 727(a)(4)(A) of the Bankruptcy Code.

Perhaps the Debtor's lawyers could have supplied better information by listing the correct case number for the Leventhal Lawsuit, included the ALG stock and related default judgment, and otherwise "cleaned up" the filings, but no errors are attributable to the Debtor. He told his lawyer every aspect of these items; he hid nothing from his Chapter 7 Trustee; for whatever reason, perhaps the complexity of the Debtor's businesses, the information simply got added or omitted erroneously to his bankruptcy papers. No basis exists to deny the Debtor a discharge under § 727(a)(4) of the Bankruptcy Code.

---

[56] UST Ex. 367. 3/2/16 Meeting of Creditors Tr. 23:17-25. On January 26, 2016, the account held 179.82 pounds sterling. UST Ex. 327. Using an exchange rat of 1.49997 USD to 1 GBP, the value of the monies in the bank account was $270, roughly confirming the Debtor's estimate.
[57] Doc. No. 107. 4/11/18 Tr. at 80:7-17; 143:20-22.
[58] Doc. No. 107. 4/11/18 Tr. at 80:18-22.
[59] *In re Dupree*, 336 B.R. 490, 494 (Bankr. M.D. Fla. 2005) (citing *In re Wills*, 243 B.R. 58, 63 (9th Cir. BAP 1999)).

*11 U.S.C. § 727(a)(2)*
*Transfers with intent to hinder, delay, or defraud creditor*

In its second count in this adversary proceeding, the UST asserts that the Debtor's aggressive attempts to stay in his Home, by granting a security interest in his Home and then agreeing to a collusive, friendly foreclosure, are transfers made intending to hinder, delay or defraud the Bank, and should prevent the Debtor from getting a discharge under § 727(a)(A)(2) of the Bankruptcy Code. Some factual background is needed to understand this argument.

As discussed earlier in this Memorandum Opinion, Debtor was an international real estate developer living a lavish lifestyle in his exclusive Home before the recession in 2008. He had paid $5.5 million for his Home,[60] paying cash of $1.65 million and getting a first mortgage loan from the Bank for $3.85 million. He also had a second mortgage of $500,000 granted by SunTrust.

With the real estate market decline, Debtor resigned from his employment in January 2009.[61] He stopped making his regular mortgage payments to the Bank, who started a foreclosure action ("Foreclosure Action").[62] Debtor, who was represented by counsel,[63] aggressively defended the Foreclosure Action.[64] Debtor desperately wanted to maintain his former lifestyle and stay in the house.

The Bank ultimately prevailed, and on November 14, 2016, obtained a final judgment of foreclosure.[65] Debtor then moved out of the Home,[66] and appealed the final judgment.[67] The

---

[60] Doc. No. 107. 4/11/18 Tr. at 41:14-20; 43:3-5; Doc. No. 70, ¶1. Stipulated Timeline Regarding Isleworth Property.
[61] UST Ex. No. 367. 3/2/16 Meeting of Creditors Tr. at 45-46:25,1-2.
[62] Doc. No. 70, ¶ 4. Stipulated Timeline Regarding Isleworth Property. The Bank filed the foreclosure action on November 24, 2009 in the Circuit Court for Orange County, Florida, Case No. 2009-CA 037094-O.
[63] Charles W. Price, Tucker H. Byrd, Benjamin Webster and Damien Prosser have represented the Debtor at various times in the Foreclosure Action.
[64] Debtor Ex. 1.
[65] UST Ex. 246.
[66] Doc. No. 107. 4/11/18 Tr. at 75:6-12. Debtor vacated the Home in December 2016.
[67] UST Ex. 248. Debtor filed a Notice of Appeal on December 2, 2016.

Florida Fifth District Court of Appeal later affirmed the final judgment on November 21, 2017.[68] The Foreclosure Action took eight years to resolve.[69]

In 2015, Phillip Yoder ("Yoder"), a soon-to-be convicted foreclosure swindler, contacted the Debtor.[70] Yoder told the Debtor he "took on the fights of foreclosures," and he would "take on the [B]ank."[71] Debtor was looking for a miracle to keep his Home and wanted to believe Yoder's promises and boasts.

Yoder or his entities and the Debtor signed several agreements, each unique and questionable. On May 5, 2015, the Debtor and Yoder, acting for KOH Enterprises, LLC ("KOH"), signed a Memorandum of Understanding, which provided upon transfer of $2,050,000 into the trust account of Debtor's foreclosure counsel, Debtor would sign a quitclaim deed of the House to KOH.[72] No payment was made, and the parties canceled this agreement a few weeks later.[73]

On May 21, 2015, Yoder delivered an "International Promissory Note" for $4,322,385.16 to the Bank,[74] and a representative of Yoder's company—Hudson Trust, LLC—fraudulently recorded a Satisfaction of [the Bank's] Mortgage in the public records for Orange County, Florida.[75] No evidence indicates the Debtor facilitated or participated in Yoder's scheme relating to the false note and satisfaction.

Yoder then called the Debtor and told him he satisfied the Bank's mortgage on the Home.[76] Debtor saw a notation in the public records that the Bank's mortgage was satisfied. But the Debtor did not review the actual written Satisfaction of Mortgage unsigned by the Bank.[77] Perhaps naively

---

[68] UST Ex. 256.
[69] Debtor Ex. 1.
[70] Doc. No. 70, ¶ 6. Stipulated Timeline Regarding Isleworth Property. Yoder contacted the Debtor April 2015.
[71] Doc. No. 70, ¶ 7. Stipulated Timeline Regarding Isleworth Property.
[72] UST Ex. No. 271.
[73] Doc. No. 107. 4/11/18 Tr. at 52:14-18; 55:6-17.
[74] Doc. No. 70, ¶9. Stipulated Timeline Regarding Isleworth Property. UST Ex. 353.
[75] Doc. No. 70, ¶10. Stipulated Timeline Regarding Isleworth Property. UST Ex. 263.
[76] Doc. No. 107. 4/11/18 Tr. at 56-57:17-25, 1-5.
[77] Doc. No. 107. 4/11/18 Tr. at 58:17-25.

but desperately wanting to believe Yoder actually had paid off the Bank, Debtor agreed to give Yoder a security interest in the Home.[78]

On July 9, 2015, Debtor and Yoder, acting for Hudson Trust, LLC ("Hudson Trust"), signed an agreement, which granted Hudson Trust a security interest in the Home and provided if the Debtor did not pay $4,322,385.16 plus any advances by September 9, 2015, Hudson Trust could foreclose on the Home.[79] Debtor and Yoder also signed another Memorandum of Understanding, which the parties ultimately revised on July 12, 2014 ("July MOU").[80] The July MOU provided upon sale of the Home by Yoder, Debtor would receive $200,000, Debtor's foreclosure counsel would receive $100,000, Debtor's family would receive $1.6 million, and Yoder would receive the balance.[81]

The Bank soon discovered the fraudulent satisfaction and, on August 7, 2015, recorded an Affidavit of Fraudulent Satisfaction in the public records for Orange County, Florida.[82] The Bank then moved to amend the complaint in the Foreclosure Action to address and undo the fraudulent satisfaction filed by Yoder.[83]

On August 24, 2015, Debtor learned of the Affidavit of Fraudulent Satisfaction and the Bank's motion to amend the complaint in the Foreclosure Action.[84] Although the Debtor knew the Bank claimed the satisfaction was fraudulent, the Debtor testified he continued to believe the satisfaction was valid, mainly because Yoder presented himself as a wealthy individual.[85] (Apparently, Yoder's attorney, Lawrence Wrenn ("Wrenn"), recently had given him a proof of funds letter stating he held negotiable instruments of over $40 million in escrow on behalf of

---

[78] Doc. No. 107. 4/11/18 Tr. at 60:19-24.
[79] Doc. No. 70, ¶11. Stipulated Timeline Regarding Isleworth Property. UST Ex. 273.
[80] Doc. No. 70, ¶12-13. Stipulated Timeline Regarding Isleworth Property.
[81] Doc. No. 70, ¶13. Stipulated Timeline Regarding Isleworth Property. UST Ex. 270.
[82] Doc. No. 70, ¶14. Stipulated Timeline Regarding Isleworth Property. UST Ex. 264.
[83] Doc. No. 70, ¶15. Stipulated Timeline Regarding Isleworth Property. UST Ex. 225.
[84] Doc. No. 107. 4/11/18 Tr. at 64:6-10. Doc. No. 70, ¶15. Stipulated Timeline Regarding Isleworth Property.
[85] Doc. No. 107. 4/11/18 Tr. at 161-62:18-15, 1-18. Debtor testified Yoder would meet him by private plane, had provided information that he spent $28 million on a penthouse, and was "carrying bundles of hundred-dollars bills" with him.

Yoder.[86])  At this point in the timeline, the Court must conclude that no sophisticated business person, like the Debtor, blindly would rely on Yoder's representations that the satisfaction was valid.

So, the Debtor's motives are suspect when, in September 2015, he agreed to allow Yoder to foreclose on the Home in a collusive, friendly foreclosure action.  Yoder and Wrenn contacted the Debtor about foreclosing the Home under the security agreement; Debtor agreed, asking no questions.[87]

On September 15, 2015, Hudson Trust filed a complaint against the Debtor to for foreclose the security interest on the Home (the "Hudson Foreclosure Action").[88]  The same day the Debtor, acting *pro se*, filed an answer and consent to the judgment.[89]  Hudson Trust then obtained a final judgment in the Hudson Foreclosure Action.[90]  The next day, on September 16, 2015, the Clerk issue a Certificate of Title which transferred title of the Home to Hudson Trust.[91]  So, the Debtor gave Yoder (or his company, Hudson Trust) a mortgage on the Home in July, 2015, allegedly believing the fraudulent note and satisfaction were valid, and then consented to a foreclosure in September, 2015, even though he now had actual knowledge the Bank was asking to void the false satisfaction.

Of course, the Bank learned about the Hudson Foreclosure Action and the collusive transfer.  On October 21, 2015, it moved to intervene and to vacate the foreclosure judgment in the Hudson Foreclosure Action.[92]  On March 28, 2016, the Florida Circuit Court granted the

---

[86] Doc. No. 107. 4/11/18 Tr. at 161:18-25; Debtor Ex. 41, pg. 619. During this time, Debtor and Yoder had entered into a joint venture to purchase and develop real property. Yoder's counsel provided the proof of funds letter dated June 2, 2015 to the property seller. Doc. No. 107. 4/11/18 Tr. at 158-59:18-25, 1-19.
[87] Doc. No. 107. 4/11/18 Tr. at 70:17-23; 71:22-24.
[88] Doc. No. 70, ¶ 16. Stipulated Timeline Regarding Isleworth Property. Hudson Trust filed the foreclosure action in the Circuit Court for Orange County, Florida, Case No. 2015-CA 08450-O. UST Ex. 46.
[89] Doc. No. 70, ¶ 17. Stipulated Timeline Regarding Isleworth Property. UST Ex. 47.
[90] Doc. No. 70, ¶ 18. Stipulated Timeline Regarding Isleworth Property. UST Ex. 48, 52.
[91] Doc. No. 70, ¶ 19. Stipulated Timeline Regarding Isleworth Property. UST Ex. 50.
[92] Doc. No. 70, ¶¶ 20-21. Stipulated Timeline Regarding Isleworth Property. UST Ex. 53, 54.

Bank's motions and vacated the final judgment and certificate of title.[93] The Florida Circuit Court then dismissed the Hudson Foreclosure Action,[94] and the Bank proceeded with its Foreclosure Action, eventually getting title to the Home in November 2016. Yoder and the Debtor's dilatory tactics hindered and delayed the Bank in its efforts to foreclose on the Home by about ten months from May 2015 through March 2016. And, most of this delay was caused by Yoder, not the Debtor.

Debtor filed this Chapter 7 bankruptcy case on January 21, 2016,[95] before the Hudson Foreclosure Action was unwound. Debtor's bankruptcy schedules disclosed assets valued at over $1.2 million,[96] and debts over $124 million, the majority of which are personal guarantees of his failed business endeavors.[97] Debtor listed the Bank as a creditor holding a claim for $6.3 million.[98] Except for this adversary proceeding, Debtor's bankruptcy case has been uneventful.[99] None of his creditors have objected to his exemptions, discharge or the dischargeability of their particular debt.[100] Specifically, the Bank has not complained of the Debtor's actions in either foreclosure case or the slight delay caused by Yoder's interference. And, the Chapter 7 Trustee has filed a report of no distribution.[101] So, no assets were collected; no creditors will receive any distributions.

During this case, the United States brought criminal charges against Yoder in Indiana under Title 18 of the United States Code for wire fraud, mail fraud, bank fraud, and making a false declaration in other bankruptcy cases.[102] (Although the charges relate to Yoder's conduct in other bankruptcy cases, the scheme is similar to the one in this case.) Yoder entered a guilty plea,

---

[93] Doc. No. 70, ¶ 24. Stipulated Timeline Regarding Isleworth Property. UST Ex. 56-58, 60.
[94] UST Ex. 58. The case was dismissed on March 28, 2016.
[95] UST Ex. 2. Doc. No. 1 in Main Case.
[96] UST Ex. 3. Doc. No. 1 in Main Case.
[97] Doc. No. 107. 4/11/18 Tr. at 30: 5-10. UST Ex. 3. Doc. No. 1 in Main Case.
[98] UST Ex. 3. Doc. No. 1, pg. 41 in Main Case.
[99] UST Ex. 2.
[100] *Id*.
[101] *Id*.
[102] Doc. No. 93-9. Judgment in a Criminal Case. *United States v. Yoder*, Case No. 3:17CR030-002, 3:18CR087-001 (N.D. Ind. July 1, 2019)

admitting to operating a "Foreclosure Rescue Scheme" in which he would monitor foreclosure notices to identify distressed homeowners.[103] He would convince the homeowners to transfer title of their property to avoid foreclosure obligations, and the homeowners would vacate the property.[104] Yoder would then cause a fraudulent "International Promissory Note" to be mailed to the bank purporting to extinguish the debt and record a fraudulent satisfaction of mortgage.[105] Yoder would then provide an "investor" with a quit claim deed purporting to transfer the property free and clear of the bank's mortgage.[106] In 2019, the District Court entered a judgment sentencing Yoder to over seven years of imprisonment.[107]

Yoder now is a felon convicted of operating foreclosure and bankruptcy scams similar to what he did in this case. And, the Debtor is not a typical consumer borrower. Mr. Wright is a sophisticated businessperson with decades of experience in international real estate transactions. So, the question is whether the Debtor's cooperation with Yoder is sufficient to deny him a discharge because he freely gave Yoder a mortgage on his Home and agreed to a collusive foreclosure action, arguably to delay the Bank's foreclosure of his Home.

Section 727(a)(2)(A) of the Bankruptcy Code states:

> The court shall grant the debtor a discharge, unless . . . the debtor, with intent to hinder, delay, or defraud a creditor…has transferred… property of the debtor, within one year before the date of the filing of the petition . . . .[108]

To warrant denial of discharge under § 727(a)(2)(A), a plaintiff must show: "(1) that the act complained of was done within one year prior to the date the petition was filed, (2) with actual intent to hinder, delay, or defraud a creditor, (3) that the act was that of the debtor, and (4) that the act consisted on transferring, removing, destroying, or concealing any of the debtor's property."[109]

---

[103] Doc. No. 93-7. Petition to Enter a Guilty Plea by Phillip Yoder.
[104] Doc. No. 93-7.
[105] *Id*.
[106] *Id*.
[107] Doc. No. 93-9.
[108] 11 U.S.C. § 727(a)(2)(A).
[109] *In re Jennings*, 533 F.3d 1333, 1339 (11th Cir. 2008).

Because the parties do not dispute within one year of the Petition date, the Debtor gave Yoder a security interest in his Home and later consented to Hudson Trust foreclosing on his Home,[110] the only issue for this Court to resolve is whether the Debtor gave Yoder the security interest and consented to the Hudson Foreclosure intending to hinder, delay or defraud a creditor—the Bank.

Courts may consider circumstantial evidence or the debtor's course of conduct when determining whether the debtor acted with intent to hinder, delay or defraud his creditors.[111] Upon consideration of the Debtor's conduct here, the Court has difficulty finding the Debtor did not intend to hinder or delay the Bank's Foreclosure Action when he gave Yoder a security interest Home and then consented to the Hudson Trust Foreclosure Action.

Debtor has significant experience with the sale and development of real estate and knew that granting Yoder a security interest in the Home would hinder or delay the Bank's pending Foreclosure Action. Debtor had been litigating with the Bank for over five years, and mediation had just resulted in an impasse.[112] Debtor was upset with the Bank, and when presented with the opportunity, he latched onto Yoder's scheme as a way to stay in the Home.

Debtor admitted he did not review the fraudulent Satisfaction of Mortgage or question why Yoder would pay off the Bank's mortgage without first having an agreement in place. The July MOU makes no sense if Yoder already had satisfied the Bank's mortgage. And, after the Debtor knew the Bank disputed the satisfaction, Debtor continued to turn a blind eye. He fought the Bank's foreclosure for years; yet he simply threw in the towel with the Hudson Trust Foreclosure Action, and by his consent, expedited the foreclosure process allowing Hudson Trust to get title in two days to the Home.

---

[110] Debtor, in his closing brief, argues the UST did not meet its burden because none of the fraudulent acts, such as recording the Satisfaction of Mortgage, delivery of the International Promissory Note and filing the Hudson Trust Foreclosure, were done by the Debtor. Doc. No. 78, pg 10. This is true, however, Debtor does not dispute he gave Yoder a security interest in the Home and consented to the Hudson Trust Foreclosure, which are the acts complained of by the UST. Accordingly, the acts complained of were done by the Debtor.
[111] *In re Jennings*, 533 F.3d 1333, 1339 (11th Cir. 2008).
[112] Doc. No. 107. 4/11/18 Tr. At 55:12-20. The mediation between the Debtor and the Bank failed on May 18, 2015.

The Court also rejects the Debtor's testimony that his foreclosure attorney "approved" the Yoder transactions; this testimony is self-serving and unbelievable. Debtor called his bankruptcy attorney, bankruptcy paralegal, and one of his foreclosure attorneys as witnesses to substantiate his defenses. Notably absent, however, was the foreclosure attorney who allegedly reviewed and approved the agreements with Yoder or his companies. The e-mails Debtor relies upon to demonstrate his foreclosure counsel's consent of the Yoder's transactions are ambiguous and demonstrate no legal "stamp of approval" for Yoder's schemes. The Court concludes that the Debtor was a knowing participant in Yoder's scam and, although he may not have intended to defraud the Bank, like Yoder, he wanted to hinder or at least delay the Bank's Foreclosure Action.

Having determined the Debtor intended to hinder or delay the Bank in its foreclosure efforts by giving Yoder a security interest in the Home and then consenting to the Hudson Trust Foreclosure, I must assess whether this conduct is sufficient to deny the Debtor a discharge. Except for his dealings with the Bank, the Debtor otherwise is an honest debtor. Debtor disclosed his assets. Debtor appeared for a lengthy meeting of creditors and cooperated with the trustee and UST. None of his creditors, who are owed over $124 million and will receive *nothing* from this case, have complained of the Debtor's actions. Indeed, the Bank, who was slightly delayed in its foreclosure action, takes no position in this adversary proceeding.[113] To put it in context, the Bank was delayed about ten months in its Foreclosure Action in a case that took *eight years* to resolve. Is it fair to deny the Debtor a discharge when no creditor complains, the actionable transfers were unwound, and the delay was *de minimus*?

---

[113] Although Steven Ellison, counsel for the Bank during the Foreclosure Action, testified in this proceeding, he no longer represents the Bank, did not testify as an agent of the Bank, and did not have authority to speak on behalf of the Bank. Doc. No. 107. 4/11/18 Tr. at 125:2-8.

Even when grounds exist for denying a discharge, the language of § 727(a) vests bankruptcy courts with the discretion to grant a discharge.[114] Courts consider the purposes of the Bankruptcy Code when exercising this discretion.[115] "[T]he inquiry in a proceeding under § 727(a) is directed toward protecting the integrity of the bankruptcy system by denying discharge to debtors who engage in objectionable conduct that is of a magnitude and effect broader and more pervasive than a fraud on a single creditor."[116] Courts evaluate whether "the debtors' prepetition debt is of such magnitude that denial of a discharge would make life virtually impossible for them" which is balanced against "the degree of heinousness evidenced by the circumstances of the violation of the bankruptcy laws which constitute the grounds for denial of discharge."[117] Denial of a discharge is akin to financial capital punishment, and is reserved for the most egregious misconduct by a debtor.[118]

In this rare instance, I will use my discretion to grant the Debtor a discharge. The Debtor's actions, although wrong, are not heinous enough to deny the discharge of debts exceeding $124 million. To deny the Debtor a discharge would cause permanent financial failure to the Debtor from which he likely could never recover and could significantly harm his family. And, because the Bank and his other creditors have no objections to the Debtor receiving a discharge, I will allow it. The integrity of bankruptcy system will not be compromised with the entry of a discharge under these circumstances.

The Court finds the UST failed to prove the Debtor made a false oath in his bankruptcy schedules and statements sufficient to justify the denial of his discharge under Section 727(a)(4)

---

[114] *In re DiGesualdo*, 463 B.R. 503, 523 (Bankr. D. Colo. 2011). *See also Union Planters Bank, N.A. v. Connors*, 283 F.3d 896, 901 (7th Cir. 2002) (bankruptcy court has discretion to grant a discharge even when grounds for denial exist); *In re Petersen*, 564 B.R. 636, 645 (Bankr. D. Minn. 2017) (same).
[115] *DiGesualdo*, 463 B.R. at 523.
[116] *In re Monus*, 167 Fed. Appx. 494, 496 (6th Cir. 2006). *See also In re Almengual*, 310 B.R. 902, 908 (Bankr. M.D. Fla. 2003).
[117] *DiGesualdo*, 463 B.R. at 524 *quoting In re Hacker*, 90 B.R. 994, 997-98 (Bankr. W.D. Mo. 1987).
[118] *In re Watkins*, 474 B.R. 625, 630 (Bankr. N.D. Ind. 2012) *quoting In re Tauber*, 349 B.R. 540, 545-46 (Bankr. N.D. Ind. 2006).

of the Bankruptcy Code. And, although the UST has met its burden under Section 727(a)(2) of the Bankruptcy Code, under these circumstances, I will use my discretion to grant the Debtor a discharge. A separate Final Judgment consistent with this Memorandum Opinion will be entered for the Debtor on both counts and against the UST. Any pending motions are denied as moot.

###

Clerk to serve.